Good morning. May it please the court, my name is Michael Corpy representing the Appellant Glassworkers Trust Funds. Like Edgar Allan Poe's purloined letter, the dispositive documentary evidence of adoption by conduct has been hiding in plain sight, so to speak, throughout the course of this case. The bankruptcy court was properly concerned about whether Todhunter was paying at rates contained in the key 2001 labor agreement, but apparently neither the bankruptcy court nor the district court on appeal actually reviewed the rates spelled out at pages 9 and 10 of the 2001 labor agreement. Both courts indicated that the question of whether the employer was paying under the rates specified in the 99 agreement or the 2001 agreement was a key item of evidence as to whether the employer had adopted the 2001 agreement by its conduct and therefore whether the court had jurisdiction. Now the cases that you cite for adoption by conduct, are any of those cases that are exactly on point to this, where there have been previous agreements that were signed and then you're asking to adopt by conduct a subsequent agreement that The Best Interiors case, as I understand it, was a case where there was a 99 to 2000 agreement, an 8F agreement like in this case that the employer was following, and then as soon as the new agreement kicked in, as in this case the employer ratified that contract, or there's evidence of ratification, because as in this case it started to pay higher contribution rates to the trust fund, union wages, that sort of thing. Had they signed the initial agreement? In the Best case? Yes. I believe they had signed the 99 agreement. They had not signed the new agreement, which is another situation that we have in this case, where there was an issue about whether the second agreement was signed, but that issue is irrelevant for purposes of whether they had adopted the agreement by their conduct. Aside from the fact of paying the higher additional rates, as we pointed out in our briefing, there's additional acts, both passive and active, that the employer, Todd Hunter, undertook. In addition to paying the higher rates for 19 months, that's more than half the period of the three-year agreement, they acquiesced to not one, but two audits, and the whole purpose of an audit is to have the trust fund come in and see whether there are employee benefit contributions that are not being paid. And there were two audits done. The employer was sued by the trust funds. They did not respond to the lawsuit. They acquiesced in the entry of an order of default and a default judgment on the basis of those audits. But there's additional undisputed evidence that has not been addressed specifically in the briefs. And Bruce Todd Hunter's December 23, 2003 letter to the union is particularly telling on the adoption-by-conduct issue. As we noted in our brief, the employer spoke in the letter about the agreements being in effect and the fact that they expire in 2004. They write the letter only six months before the 2001 agreement is due to expire, which implies That letter is the one that's dated December 23, 2003. That's correct. Well, the court did address that letter, though, did it not, and said that you introduced it for one purpose, but that Bruce Todd Hunter explained it saying that he wrote it at the advice of counsel and the court looked at it and sort of saw two parts to it, could see how you could interpret that way, but then pointed to an indication in there that they couldn't really live up to the obligations. Of the 2001 agreement. That's the only agreement that's referenced in the letter. If they didn't believe they were bound by the agreement, they wouldn't have felt the need to send the letter. If they had felt that the 1999 agreement had expired, which is basically Okay, that's your interpretation, but that's not what he said before the court, correct? Well, what he did say in the transcript of the proceeding at SCR 124, he was explaining his intent in writing the letter, and Bruce Todd Hunter said very significantly, and I quote, I didn't realize Bud, that is his brother, the president of the company, I didn't realize Bud didn't sign a contract, unquote. Now, the only way I think that that could be properly interpreted is that he thought that he had signed a contract, and that's why they were abiding by it. Is the proper interpretation a question of fact, or is it a question of law? Well, the proper interpretation is a question of fact, but under the clearly erroneous standard, one can look at the total corpus of the facts, and not only the conduct that was done objectively in terms of the documentary evidence, but also the testimony interpreting the letters. There is testimony in the record where Bruce Todd Hunter said his intent in sending the letter was to negotiate, I'm quoting, to negotiate for a lower price for wages. We couldn't afford the health care. I wanted to bring the wages down where I could survive. Now, as far as the wages are concerned, they must have been abiding by the wage provisions of the 2001 labor agreement, or else he wouldn't have felt a need to negotiate with the local on that point at all. And so taking the letter together with the testimony about the letter, the conclusion seems to be rather inescapable, that there was a contract in place as far as Todd Hunter was concerned, and the fact-finding court clearly made a mistake in interpreting it any other way. So we have not only the objective evidence, the documentary evidence, the testimonial evidence about the letter that was sent, but we also have simply the fact that both the district court and the bankruptcy court were critically concerned about whether they paid at the rates in the 2001 labor agreement. It is true that the trial counsel did not point the bankruptcy court directly at pages 9 and 10 of the 2001 agreement. Now, did Todd Hunter Brothers Glass, Inc. receive the full extent of benefits under the 2001 collective bargaining agreement that it would have received had it signed the 2001 collective bargaining agreement? Absolutely. I mean, it paid at the rates. The testimony was they were concerned about the expense of the health care. That clearly indicates that the employees were getting the health care. So they made the exact payments of the 2001. There weren't some payments for less. No. No. I mean, if you look at the documentary evidence and simply take out a calculator, the rates on the remittance reports are precisely the same as the rates in the 2001 labor agreement. We have the declaration from the trust administrator saying that they paid consistently for 19 months in accordance with the rates on the reports, which again are the same as the rates in the labor agreement. There was an argument made below that the payments were spotty. That's the word used by counsel. But in fact, they were quite consistent. I mean, the period of the contract was 36 months, and they paid consistently almost $96,000. That's an average of about $5,000 a month for over a year and a half. A small business doesn't pay out that kind of money unless they have an understanding that they're obligated under a contract of some sort. And if they were simply trying to preserve the status quo with respect to the prior agreement, they wouldn't have bumped up the rates. So also we've got this negotiation going on with the union, two and a half years after the 2001 agreement went into effect. There is clearly, you know, a perception on the part of the employer that it's bound by an agreement. They can't make the payments because of financial difficulty. They ultimately go into Chapter 11 bankruptcy before the 2001 agreement expires. But the negotiations and the correspondence all arise at the end of 2003, when the parties were already two and a half years into it. So that being the case, it doesn't make sense to interpret the facts in any other way, other than that the employer considered itself bound by the 2001 agreement. And it seems also apparent from the judge's ruling, both courts' rulings, that if it had been made clear to the courts that the 2001 agreements had been followed by payment of the increased rates, which is clear if you simply look at the contracts and compare them with the remittance reports, that that was a key issue for the court. And if it had been made clearly aware that those higher rates had been followed and then you put the other pieces of the puzzle together, there's no question that there's been an adoption of this contract by the employer. So you're saying even though the evidence was all there and the court acknowledged that there was an initial letter written by one of the Todd Hunter brothers saying, we can't, you know, we've got to, you know, we can't pay what you're asking for in this 2001, then there's the letter that's referenced and there was testimony to that effect, why the person said that they wrote it on the advice of counsel, but they still hadn't intended that the district court missed something? What the district court did not do apparently was to look at those pages of the labor agreement because the district court tracked the reasoning of the district court, tracked the reasoning of the bankruptcy court. And what it all boiled down to when you get rid of the forgery issues and the validity of the 1909 agreement and all of that. Well, something's in the record. Don't we presume that the court had it before it? And so you're in a position more of saying the district court didn't interpret it the way you wanted it interpreted, but, you know, I mean, we can't say that the district court didn't see it. Well, it's conceivable the bankruptcy court didn't see it because the bankruptcy court acknowledged not once but twice during the proceedings that this at one point the bankruptcy court said that being a bankruptcy judge that she had really had very little familiarity with labor law and had to come up to speed with labor law issues in order to decide the case. And in the colloquy with counsel in closing argument on December 9, 2004, I'm referencing SER 182, the bankruptcy court asked counsel, how can you tell by the rates in these reports what either party thought about which contract was in effect? And counsel said, you know, we really need an auditor for that because they could look at the rates and tell you those rates are this for a fact. I can't tell you. Well, the fact of the matter was that he could have told her. It's simply a matter of juxtaposing the labor agreement with the remittance reports and the whole exercise would take five minutes or less. And apparently that wasn't done. And this isn't like those line of cases in the summary judgment context where that hold that you're not obliged, that the trial court is not obliged to go digging through a voluminous record to find tribal issues of fact in the summary judgment context. Here it's strictly a question of understanding what the labor agreement says. The bankruptcy court pointedly asked counsel about that. Counsel didn't give the court the direction that she needed, and apparently she didn't go to the labor agreements herself because this question of whether they paid under the 2001 agreement versus the 99 agreement was key for the court, and understandably so, but the court apparently didn't take that next step of just simply looking at the evidence. But if the court believed that the initial letter was the intent and resolved that against you factually, then you have to overcome that, correct? Well, the initial letter has to do with the intent of whether the 1999 agreement is in effect. The initial letter was sent before the expiration of the 1999 agreement at the end of June 2001, and the only letter that we have subsequent to that is the one that was over two and a half years later in December of 2003, which talks only, you know, by that time the 99 agreement is history. Nobody's talking about that anymore, and the only question is whether the 2001 agreement needs to be negotiated in 2004 and whether negotiations need to be opened up for that. So if there had been... Do you want to save any time for rebuttal? I do. Okay. Thank you very much. I think we have your argument in mind. I should let you know, I think I do see the law students now, so... Ah, okay. I'll be on my best behavior. Yes. From Seattle U, so there'll be... And I think we mostly have Washington lawyers today, maybe a Portland lawyer. So we welcome the law students, and we hope that you enjoy the argument. Good morning. My name is Jud Lees. I represent the Appellee Todd Hunter Brothers class. To follow what counsel for appellants said, the Perlourne letter was indeed out of sight on the date of the hearing on December 9, 2004, and it was in counsel's pocket. In fact, counsel referenced the exact transcript citation that I would have, which is the court asked directly, what does this stack of documents mean? And in their brief on page five, they quote from the oral, the transcript of her oral ruling the following day, and she referenced the repeated questions that she asked on the date of the hearing, which is, what does this mean? You have the burden of proof. And counsel's argument here to this court attempts to transfer the burden of proof to proving adoption by conduct from the trust fund to the court. And I'm quoting, this is on page five of their initial brief, their appellant's initial brief, and this is the bankruptcy court talking. There is no evidence that the debtor accepted the benefits of the 2001 agreement. Maybe it's my own inability to read in a sophisticated manner the reports that are attached to Donna Whitford's declaration. Donna Whitford was the trustee. And she didn't, as an aside, in her initial declaration indicate anything other than, I received these trust fund reports, they are what they are. It was in a supplemental declaration three months after this hearing in a motion for reconsideration, which the court properly deemed was not really newly discovered evidence but an attempt to supplement the record, that she indicated that these are tied to the 2001 agreement. Now, how did the court deal with the December 23, 2003 letter? Just as you indicated in your questioning, they looked at the intent behind the letter as they're supposed to do in looking at adoption cases to determine the actual motivation on the part of the employer and to determine whether that motivation was credible. And the testimony on the behalf of Bruce Todhunter for sending that subsequent notice of termination was, it was prepared by counsel and it was submitted based on advice of counsel out of an excess of caution. Remember now, the testimony here by both Bruce Todhunter and Harold Bud Todhunter was that the union was not acknowledging any termination of even the 1999 agreement. And clearly there was no understanding that there was a repudiation. Two findings of fact that the court entered in the bankruptcy, the bankruptcy court agreed with and are not the subject of appeal here today. The union was telling them, at least this is the credible evidence that she found credible, was that there's been no termination, you owe us, we're going to sue you. And in fact, he testified that he was advised by the union business agent that you cannot terminate a contract until you're current in your trust fund contributions. She therefore ruled that the post-termination, post-repudiation contributions were made, did not constitute evidence that the contractor held himself out as a union contractor, but were based on confusion and based on misrepresentations made by the union. And that's a perfectly proper determination by the court in reviewing the evidence. In the Beck engineering case, the Ninth Circuit decision, the court was looking at, and this was a case that was heavily relied upon. Since it was a factual finding, what standard are we reviewing that by? Clear error. And moreover, it's a factual finding based on a credibility determination, so the standard review is even greater. She believed my client with regard to the motivation. Again, that's perfectly proper analysis. And the courts have repeatedly said in reviewing these, in making these adoption by conduct decisions, that post-termination, post-repudiation trust fund contributions are really notoriously disreputable evidence, if you will, of an adoption by conduct because they can be made for a variety of reasons. If they're made at a higher rate, that might make a difference. Certainly, I can see why the contributions would have to continue at the older rate for fear of committing an unfair labor practice. But if they're made at the new rate, I would think that would be at least evidence of adoption. Two points in response, Your Honor. One is that contrary to representation by appellate, the trial court, the bankruptcy court in this case, did not say that was a dispositive issue. That had it been under the old contract, that would have found adoption. It wasn't a key issue. It was among the litany of issues, and primarily her expression of frustration as to what happened. But in response to your question, we've cited in our briefing, and there are cases where post-termination there are trust fund contributions even under the new rate, and that's insufficient to satisfy the requirement for manifesting an intention to be bound. What case is that? The, again, the Ninth Circuit decision of Operating Engineers v. Beck, found at 746 Fed 2nd, 557, Ninth Circuit, 1984, and the O'Connor v. Carpenters decision, 702 Fed 2nd. Well, is that back when we didn't think we could even adopt an ADF contract by conduct? That was. It was, but that wasn't the key holding there. They were looking, obviously, the determination in O'Connor and in Operating Engineers v. Beck was not whether or not there was an ADF agreement, and they threw it out. It was a 9A agreement. But the holding by the Ninth Circuit in changing its mind from not allowing adoption by conduct for ADF was, we're going to treat them the same. The analysis, I would argue, is the same with a 9A agreement than with an ADF agreement, and the payment of new rates is insufficient. And the cases they rely on, where adoption by conduct was found, have a litany of additional activity going on, use of a hiring hall, there's a much longer duration of trust fund contributions, union negotiations in which the employer admitted that they were bound and then later disclaimed the ability to obtain work for union-only general contractors. That was the Todd v. McNeff case. In that case, the employer was approached by the union. He declined to sign. The union then brought the general contractor into the same room and said, and the general contractor said, sign and you're not getting the work. When the employer later attempted to repudiate that agreement, the court said, because you wouldn't have gotten that work otherwise. We don't have any of that evidence here. And, in fact, let me continue with that quote because it gets to that. Because the court was very focused on this issue. I was surprised. As a labor attorney, I rarely if ever find myself in bankruptcy court. But she really had done her homework. And she said, I don't know what the reports mean, which, again, I would argue was not her responsibility. They're presenting the case. They have the burden of proof. She goes on to say, there is no evidence as to whether the projects that the debtor worked on that are reflected in these reports were projects that the debtor could not have worked on had it not been a member of the union. That's the Todd v. McNeff situation. There is no evidence that the debtor hired only union laborers. Again, a key ingredient. If that employer is taking advantage, is reaping the benefit of that agreement, and is using the hiring hall, is remittance of union dues, is other evidence of manifestation of conduct that is needed in this type of case. And she asked that question. She, in essence, laid the case out for the trust fund to make, and they couldn't even answer that simple question, which is are these trust fund contributions under the old or the new one? And you heard the quotation in which counsel said, I don't know. We need an auditor to answer that question. And she indicated, without further testimony, there's insufficient evidence. But she based her ruling not on that simple proposition. She based her ruling on the reason, the explanation provided by the employer for the post-termination, post-repudiation contributions, and the justification for sending that 2003 second notice of termination, and determined that that was insufficient. And under the Beck Engineering case and other cases, that is perfectly appropriate. And the reason why the court in Beck Engineering said conduct after notice of termination or repudiation is more suspect than not, and the Beck Engineering court discusses this, is by sending a notice of termination, by repudiating a contract, which the court found had occurred here at a face-to-face meeting with the union, the union is on notice that that employer says, I am not bound. I am not bound to this agreement. And that subsequent conduct that may differ with that, again, in the Ninth Circuit's decision of Beck Engineering, they said, you can't render that statement, that repudiation ambiguous, via conduct that occurred afterwards. Well, the significance of all of this is because your client had a default judgment against him in state court, correct? That's correct. And so if, in fact, there was, if your client adopted the collective bargaining agreement by conduct, then they would be able to make a claim in the bankruptcy court. That's correct. If they did not, then the state court would have not had jurisdiction, and then it would have to be before the National Labor Relations Board. Is that correct? That's correct. This is all subject matter jurisdiction. And the trust fund attempted to establish that subject matter jurisdiction in two ways. One, ah-ha, we have a signature page that they signed, and opposing counsel characterized that as the red herring of the brightest hue. Well, it was a red herring of their creation, in fact, and they submitted three months later another supplemental declaration that said, we found another page. Unfortunately, it was ostensibly signed, let's see, six months after it was faxed. The court had no problem. So they went, that was the primary thrust of that presentation. Hence, to a certain degree, the court's frustration on December 9, we said let's turn to the adoption by conduct argument. I had to jump through the hoops first of termination and repudiation. She said, the onus is on you, Mr. Lees, to make that determination. And then the burden shifted. And you see the result. They made, they submitted these remittance reports, no testimony. There was a testimony of a union business agent regarding what happened in the negotiations, and he really provided the fodder for her finding that there had been repudiation. Mr. Lees. Yes. Apparently, the 1999 agreement was terminated because the Todd Hunter brothers could not pay the amount or said they could not pay the amount of the contributions. They were too high. Is that right? No, the 1999 agreement, I'm sorry, Your Honor, was the one that they had signed. They provided timely notice of termination, so that terminated by virtue of the fact. But why did they terminate it? The primary reason was there was no testimony regarding this, but affordability. The implication kind of is that it was too expensive. Yes. Then the union demands or presents a new contract, and this is for even higher contributions. And all of those contributions are not made, but some of them apparently are. And I get the impression that the reason that some of them were made was because there were threats by the union to sue the company if they didn't make the contribution. Is that right? That's correct. What other reason did they give for making the contributions that they did make? Because, as they testified at the hearing, they were advised by the union that they could not terminate until they were current in their trust fund contributions, and she found that testimony credible. And it's not unusual in these situations. They couldn't terminate what? Couldn't terminate the agreement. Which agreement? Couldn't terminate the relationship with the bargaining. It's not clear as to whether it's the existing agreement or the prior agreement. There may have been representations that you're automatically bound. The notice of termination that the court found dispositive wasn't discovered until immediately prior to the hearing on December 9, and it was in the possession of the union. The trust fund, to a certain degree, has to live or die by the union because it is a third-party beneficiary. An employer never signs an agreement directly with a trust fund. It signs an agreement with the union. So it's not unusual for an employer to assume that the union representative represents the trust fund, as in this case, and any representations by that union representative, good, bad, or indifferent, may bind that union. And they were told repeatedly, keep it up or we're going to sue. They ultimately were sued, and they were found to have not paid the trust fund contributions, which I would argue is at least additional evidence that they weren't complying with that agreement. But absent evidence, other evidence compelling evidence. When you're saying that's the default judgment. Yes, ultimately the default judgment, yes. Yeah, there was a shortfall there. But absent, again, all the dispositive cases with regard to adoption by conduct require more, and they've specifically said that post-termination, post-repudiation conduct is insufficient because a clear message has been sent to the union that we no longer belong. Let me just see if I understand your argument. You're basically arguing that there were factual disputes. There were findings made by the judge that resolved those. Some involved credibility. And so on a clearly erroneous standard, the court can't reverse. That's correct. But the court could reverse if there was a case out there that took all of these facts with all of the findings and said it's a matter of law, that's adoption by conduct. The courts have repeatedly held that that's a finding of fact. The Koch case, the K-O-C-H case, that is, in fact, cited by counsel for the appellant in this case. But if there were a case out there that were factual, that were these facts as found, that said that is as a matter of law. That's correct. And that's what you're saying, but you're saying short of that, these were factual findings and they're not clearly erroneous, and that's why the judgment should be affirmed. That's exactly right. If you had the converse of the Best Interiors case where they determined on a summary judgment that that was correctly given based on these facts and the facts matched our case, then, yes, you would be bound. But all Best Interiors said was, and they had a the facts of Best Interiors was far different than ours. There was additional information. There was use of the hiring hall, all sorts of litany of things. And all the court ruled there. Now, had the court in reviewing Best Interiors said, we're not only not going to overturn the summary judgment in favor of the employer, we're going to give summary judgment to the trust fund, they might have a leg to stand on. But all the Ninth Circuit there said is, there's sufficient evidence to go to a prior fact as to whether or not there was adoption. All right. Your time's expired and there don't appear to be additional questions. Thank you. Thanks so much. All right. I think we have his argument in mind. So you're saying it's clearly erroneous, but you're also saying as a matter of law on these facts, even assuming the factual findings that Best Interiors supports your position? That's correct, Your Honor. And as far as finding as a matter of law, I mean, no two cases are exactly the same, obviously, but the Second Circuit's Brown v. Volante decision,  because there were remittance reports consecutively submitted, there was cooperation with an audit, as in this case, payment of union wages, which is clearly implied by the correspondence, and a letter acknowledging a responsibility of the funds. And so those facts align fairly clearly. What about counsel's argument, though, if why did you get a default judgment against his client if the client had paid you everything that the client was required to pay under the agreement? Oh, that's not the case. The default judgment is for contributions due and owing exclusively under the 2001 agreement. Now, I don't know what these nebulous threats of litigation are about, but it should come as no surprise that when an employer doesn't pay its contributions and months go by and an audit is required to determine what's due, a lawsuit is brought to enter a judgment for the unpaid contributions. My understanding was that you said that factually they paid everything that they were required to under the 2001. Oh, not everything. They paid for 19 months, but they didn't pay for the next, what, 17 months until the agreement expired in 2004. So the default judgment, and we addressed the accounting in that in one of our footnotes in our reply brief, is that they paid most of the contributions consistently that were due. The audit picked up another $10,000 or $15,000 they hadn't paid through inadvertence or whatever, and then for another six or seven months there was nothing paid whatsoever. So the bulk of the judgment had to do with that latter portion of the audit period, concluding, I believe, in 2003. So they paid for a long time, but then they stopped paying altogether, and that's what the default judgment was all about. All right. Unless there's other questions, your time has expired. All right. Thank you very much. Thank you both for your argument. I think it was helpful to the court, and I would compliment both of you on a good job and say that you appropriately lived up to my expectations for being a good example for preparedness for the law students when they argue. And I don't say that to everyone, so thank you. This matter will stand submitted.
judges: Canby, Thompson, Callahan